**TAHOE–SIERRA PRESERVATION COUNCIL, INC., et al., Plaintiffs,**

v.

**TAHOE REGIONAL PLANNING AGENCY, et al., Defendants.**

No. CV–N–84–257–ECR.

United States District Court, D. Nevada.

Jan. 15, 1999.

Lawrence L. Hoffman, Law Offices of Lawrence L. Hoffman, Tahoe City, CA, for Plaintiffs.

Daniel E. Lungren, Atty. Gen. of the State of Cal., Richard M. Frank, Asst. Atty. Gen., Daniel L. Siegel, Supervising Deputy Atty. Gen., Mary J. Scoonover, Deputy Atty. Gen., for Defendant State of Cal.

Frankie Sue Del Papa, Atty. Gen. of State of Nevada, William J. Frey, Deputy Atty. Gen., for Defendant State of Nevada.

Susan E. Scholley, E. Clement Shute, Jr., Ellison Folk, J. Thomas Susich, for Defendant Tahoe Regional Planning Agency.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, and ORDER

EDWARD C. REED, Jr., District Judge.

On December 1, 1998, after fourteen and a half years of litigation, the first phase of the trial in this action finally began. The case involves approximately 449 plaintiffs who own property in the Lake Tahoe Basin. The lead plaintiff, Tahoe–Sierra Preservation Council, Inc. ("TSPC"), is an association of Tahoe area property owners. Each of the individual plaintiffs has alleged that several ordinances enacted in the early 1980s by the defendant, Tahoe Regional Planning Agency ("TRPA"),[1] effected takings of his or her property under the Fifth and Fourteenth Amendments to the United States Constitution. Given the complexity of the case, as well as the sweeping changes in the law of regulatory takings that have occurred in the past fifteen years, it is, while unfortunate, not surprising that the case has been pending for so long. The first ten years or so were spent largely in an effort to determine whether any of the claims in the case were justiciable at all.

Clearly, however, the effort expended in this case-by all the parties and by the courts-has not been wasted. The dispute here is not over something trivial or unimportant. For what is at stake, at least in part, is the survival of Lake Tahoe, one of the wonders of the natural world. Whatever the ultimate outcome of this case, the fate of the lake deserves serious attention and thought. That, it has unquestionably received. The very tenacity with which the property owners herein have pursued their claims supports the idea that the lake is worth fighting for. Were the Tahoe Basin not such a beautiful, desirable place to spend time, it is doubtful that the plaintiffs would have pursued their claims quite as vigorously, or in quite the same manner, as they have done over the years.

Unsurprisingly, a case pending for such a long period of time picks up something of a history along the way. Here, that history consists, in part, of three published Ninth Circuit opinions, at least five published district court opinions, and numerous unpublished district court orders. These orders and opinions have significantly narrowed and defined the scope of this case. Of course, many of these opinions also set forth versions of the facts, or some of the facts, involved in the case. We do not find it appropriate merely to refer to earlier statements of the facts, however, given that those statements were largely prepared in ruling on motions to dismiss or motions for summary judgment,

---

1. We note here that while both the states of Nevada and California have continued to act as if they were still defendants in the case, all claims against both states were actually dismissed long ago. Nonetheless, since most of TRPA's funding comes from the two states, and thus any judg- ment rendered against TRPA may have an impact on the states, and there being no objection by the plaintiffs, we allowed attorneys representing both states to participate in the trial, and generally to continue in the case.

where certain assumptions are made that may not always find themselves borne out by the evidence produced at trial. We thus present a complete discussion of the facts herein; we base our findings on the evidence and testimony presented at trial, and the stipulations agreed to by the parties.

## FINDINGS OF FACT

Lake Tahoe, the dominant presence in this litigation, is a remarkable alpine lake located in the northern Sierra Nevada mountains. The lake is almost indescribably beautiful. Nonetheless, many have tried to describe it- the most notable of whom (and certainly the most quoted, at least during this trial) is Mark Twain. Twain, while famous for his hyperbole, cannot be said to have exaggerated the beauty of Lake Tahoe, which he described as:

> a noble sheet of blue water lifted six thousand three hundred feet above the level of the sea, and walled in by a rim of snow-clad mountain peaks that towered aloft full three thousand feet higher still! ... As it lay there with the shadows of the mountains brilliantly photographed upon its still surface I thought it must be the fairest picture the whole earth affords.

Mark Twain, *Roughing It* 169 (facsimile reprint of 1st ed., Hippocrene Books, n.d.) (1872). Further, the lake:

> was glassy and clear, or rippled and breezy, or black and storm-tossed, according to Nature's mood; and its circling border of mountain domes, clothed with forests, scarred with land-slides, cloven by cañons and valleys, and helmeted with glittering snow, fitly framed and finished the noble picture. The eye was never so tired of gazing, day or night, in calm or storm; it suffered but one grief, and that was that it could not look always, but must close sometimes in sleep.

*Id.* at 173.

Others, too, have attempted to describe the beauty of the lake, including sources more commonly cited in judicial opinions than Mark Twain. These include the Supreme Courts of California and Nevada, and even the President and Vice President of the United States. In July of 1997, President Clinton and Vice President Gore both attended the "Lake Tahoe Presidential Forum" in Incline Village, Nevada, on the northeast shore of the lake. The President referred to Lake Tahoe as "one of the crown jewels, unique among them all. It's a national treasure that must be protected and preserved." Sean Whaley, *Clinton Pledges Tahoe Aid,* Las Vegas Rev.-J., July 27, 1997, at 1A. The Vice President stated that, "There is a peace associated with Lake Tahoe that is very, very special.... The beauty of this place is unique in all the world." Sean Whaley, *Gore Vows to Protect Lake,* Las Vegas Rev.-J., July 26, 1997, at 1A. The Nevada Supreme Court called the lake a "national treasure," *Kelly v. Tahoe Reg'l Planning Agency,* 109 Nev. 638, 855 P.2d 1027, 1034 (1993), and the California Supreme Court referred to the Basin as "an area of unique and unsurpassed beauty." *People ex rel. Younger v. County of El Dorado,* 5 Cal.3d 480, 96 Cal.Rptr. 553, 487 P.2d 1193, 1194 (Cal.1971). The plaintiffs, quite wisely, do not dispute the fact that Lake Tahoe is uniquely beautiful.

Ironically, the more Lake Tahoe comes to be appreciated for its beauty, the more that beauty is threatened. Part of what makes Tahoe so special is the amazing clarity of its water, which, as a result of its clarity, is an unusually beautiful cobalt blue color. Again, we revert to Mark Twain for a description. He described the clarity of Tahoe's water as follows:

> So singularly clear was the water, that where it was only twenty or thirty feet deep the bottom was so perfectly distinct that the boat seemed floating in the air! Yes, where it was even *eighty* feet deep. Every little pebble was distinct, every speckled trout, every hand's-breadth of sand.... Down through the transparency of these great depths, the water was not *merely* transparent, but dazzlingly, brilliantly so. All objects seen through it had a bright, strong vividness, not only of outline, but of every minute detail, which they would not have had when seen simply through the same depth of atmosphere. So empty and airy did all the spaces seem below us, and so strong was the sense of floating high aloft in mid-nothingness, that we called these boat-excursions "balloon-voyages."

Twain, *Roughing It* 174–75 (emphasis in original); *see also* Mark Twain, *Innocents Abroad* 262–265 (Harper & Brothers 1911) (1869) (comparing Lake Tahoe to Italy's Lake Como). Most lakes lack anything approaching this clarity, usually because of the presence of algae growing in their depths. Algae requires a nutrient-rich environment in which to grow, and most lakes contain sufficient amounts of the requisite nutrients to feed considerable algal growth. Not so Lake Tahoe, however, which has historically been lacking in both nitrogen and phosphorous, two of the nutrients algae requires. A lake which is deficient in such plant nutrients, like Tahoe, is "oligotrophic."

Unfortunately, this is rapidly changing. The clarity of the lake has been decreasing by at least a foot a year. As algal growth in the lake increases, its clarity decreases. In other words, the lake undergoes what is termed "eutrophication." Eutrophication is the process of becoming more "eutrophic," which, at least as it relates to a lake, is defined as "rich in dissolved nutrients ...." Webster's Third New International Dictionary 786 (1976). Eventually, unless the process is stopped, the lake will lose its clarity and its trademark blue color, becoming green and opaque for eternity. Or at least, for a very, very long time. Estimates are that, should the lake turn green, it could take over 700 years for it to return to its natural state, if that were ever possible at all.

The increase in algal growth, and the attendant loss in water clarity, is caused by an increase in the amounts of nitrogen and phosphorous reaching the lake. The evidence clearly shows that this increase in nutrient levels is caused by increased development in the Lake Tahoe Basin ("the Basin"). Dramatic decreases in clarity first began to be noted in the late 1950s/early 1960s, shortly after development at the lake began in earnest in the 1950s. Clarity has decreased steadily since then. Even today, increased algal growth is more noticeable in areas of the lake near larger concentrations of human habitation and development.

Increased development causes increased nutrient loading of the lake largely because of the increase in impervious coverage of land in the Basin resulting from that development. Impervious coverage-such as as-phalt, concrete, buildings, and even packed dirt-prevents precipitation from being absorbed by the soil. Instead, the water is gathered and concentrated by such coverage. Larger amounts of water flowing off a driveway or a roof have more erosive force than scattered raindrops falling over a dispersed area-especially one covered with indigenous vegetation, which softens the impact of the raindrops themselves. Apparently, even the force of a raindrop falling on bare earth has some erosive power, which the presence of vegetation mitigates. Thus disruptions to the natural plant cover caused by development further exacerbate the problem. The increase in impervious coverage seems to be a larger problem than the loss of plant cover, however-perhaps because so much of the Basin's precipitation falls in the form of snow. One can only assume that a snowflake impacts the ground with less force than a raindrop. Yet runoff from the melting snow still produces erosion.

The concentrations of water running off areas of impervious coverage then flow rapidly over areas of uncovered earth, picking up nutrient-rich topsoil and bits of vegetation and debris as they go. The increase in runoff thus causes more debris and soil-and hence more nitrogen and phosphorous-to reach the lake than under natural conditions. Generally speaking, the steeper the slope, the more runoff will occur. Thus areas with steeper slopes are usually considered "high hazard" lands.

Of course, there is always some naturally occurring runoff. Normally, however, much of the runoff from upper elevations never reaches the lake. Instead, certain areas near streams and other wetlands-known as Stream Environment Zones ("SEZs")-act as filters for much of the debris that runoff carries. When SEZ lands are filled in and paved over, however, they cease to perform their natural function. Thus not only do the paved-over SEZ lands increase erosion due to the new impervious coverage, they also fail to mitigate erosion occurring at higher elevations farther from the lake. SEZ lands are therefore considered especially sensitive to the impact of development.

The most obvious response to this problem, of course, is to restrict development around the lake-especially in SEZ lands, as well as in areas already naturally prone to runoff. Given the high desirability of the Tahoe Basin as a place to live and to vacation, however, restrictions on development, when they were imposed, were not well-received by all parties involved. Of course, if no one wanted to live there, no restrictions on development would have been necessary-leading the California Supreme Court to remark, almost thirty years ago, that "the region's natural wealth contains the virus of its ultimate impoverishment." *People ex rel. Younger v. County of El Dorado*, 5 Cal.3d 480, 96 Cal.Rptr. 553, 487 P.2d 1193, 1194 (1971). Clearly, though, people do want to live there-or at least vacation there. More people come to Lake Tahoe every year. While this classic struggle between development and the environment has been played out all over the country, the Tahoe area has seen some particularly epic battles of this kind.

The developing environmental problems at the lake first received significant attention in the 1960s. Given that two states, five counties, several municipalities, and the federal government (which, through the U.S. Forest Service, owns a large percentage of the land in the Basin) have jurisdiction over part of the lake or the surrounding area, the need for some type of coordinated response to the problem was obvious. Thus in 1969, the bi-state Tahoe Regional Planning Compact was approved by the United States Congress, after being passed by the legislatures of both Nevada and California. Pub.L. No. 91–148, 83 Stat. 360; 1967 Cal. Stat. ch. 1589, p. 3804, § 1, *amended by* 1968 Cal. Stat. ch. 988, p.1900, § 1; 1968 Nev. Stat. 4. The Compact created the defendant TRPA, and set goals for the preservation of the lake and the surrounding Basin.

Pursuant to the Compact, TRPA adopted, in 1972, Ordinance No. 4, a Land Use Ordinance which incorporated what is commonly known as the Bailey system. TRPA Ordinance No. 4, §§ 5.00, 6.00 (Defs.' Ex. 201). The Bailey system, named for its developer, Robert G. Bailey, classifies land in the Tahoe Basin according to how prone to environmental damage it is. *See generally*, Robert G. Bailey, Forest Service, U.S. Dept. of Agriculture, *Land–Capability Classification of the Lake Tahoe Basin, California–Nevada: A Guide for Planning* (1974) (Defs.' Ex. 203). Generally speaking, land with steeper slopes is naturally more prone to runoff, so even slight disturbances in vegetation or increases in land coverage can result in large increases in nutrient runoff. Bailey thus divided land in the Basin into seven "land capability districts," based largely on steepness, but also taking into account flood hazard, high water tables, poorly drained soils, landslides, fragile flora and fauna, and soil erodibility. These land capability districts are numbered 1 through 7, with 1 being the most environmentally sensitive, and 7 the least (relatively speaking). Each land capability district was assigned a land coverage coefficient-a recommended limit on the percentage of such land that could be covered by impervious surface. The coefficients are as follows:

| | |
|---|---|
| land capability districts 1 and 2 | 1% |
| land capability district 3 | 5% |
| land capability district 4 | 20% |
| land capability district 5 | 25% |
| land capability districts 6 and 7 | 30% |

Generally, land capability districts 1 through 3, because of the higher risk of erosion associated with these areas, are grouped together and denominated "high hazard" or "sensitive" lands, while land capability districts 4 through 7 are referred to as "low hazard" or "non-sensitive" lands. (Actually, Bailey himself grouped them slightly differently, but that is how TRPA grouped them for planning purposes, and how they have been grouped throughout this litigation.) On average, "Class 1–3 lands" are the steepest lands in the Basin. SEZ lands constitute a special category of high hazard lands, and are classified as "1b" lands-sort of a subsection of land capability district 1. While SEZ lands are generally much less steep than other district 1 lands, they are nonetheless extremely sensitive, due to the nature of the function they perform when left in their natural state, as discussed above. Throughout, we refer to "Class 1–3 lands" and "SEZ lands" separately; although technically the term "Class 1–3" could be read to include SEZ (or 1b) lands, for clarity we have defined the term to exclude SEZ lands.

However, although Ordinance No. 4 adopted the Bailey system, it allowed numerous exceptions to the coverage recommendations. The building of new residential housing was not particularly limited. This led to significant dissatisfaction with TRPA's regulatory scheme. It became evident that the environment was continuing to decline, and that the 1969 Compact was not strong enough to fix the problem. California became so dissatisfied that it pulled its funding from TRPA, and its own agency, the California Tahoe Regional Planning Agency (formed in 1967, prior to the adoption of the Compact), began to impose stricter regulations on that part of the Basin lying within California.

Eventually, this dissatisfaction led to the amendment of the Tahoe Regional Planning Compact in 1980. Pub.L. No. 96–551, 94 Stat. 3233; 1980 Cal. Stat. ch. 872, p. 2710, § 2, codified at Cal. Gov't Code § 66801; 1980 Nev. Stat. 1, codified at N.R.S. 277.200 (the "1980 Compact"). The 1980 Compact restructured TRPA and its voting procedures, and directed it to establish environmental threshold carrying capacities and a new regional plan within a strict time table. The amended Compact became effective December 19, 1980; TRPA was required to adopt threshold carrying capacities within 18 months of that date, and a new regional plan within 12 months of the adoption of the carrying capacities. In addition, the amended Compact required that TRPA review all projects, and established temporary restrictions on development in the Basin pending the enactment of a new regional plan.

In addition to the requirements of the Compact, TRPA was faced with the need to develop a regional water quality plan, or 208 plan, as required by the EPA under the Clean Water Act, 33 U.S.C. § 1288 (1986). Although TRPA had proposed a 208 plan in 1979, California had rejected it, and agreement on a plan had still not been reached by the time the Compact was amended. Thus at the same time TRPA was grappling with the new Compact requirements, it was still embroiled in debate over the 208 plan. The plaintiffs have pointed to the fact that TRPA expended resources during the time immediately following the Compact's amendment on an (ultimately successful) attempt to develop a 208 plan, and have claimed that this is some kind of evidence that TRPA acted in bad faith in complying with the Compact requirements. This argument is completely meritless. TRPA was under an obligation to development a 208 plan, and the agency clearly approached its obligations under both the Compact and the Clean Water Act with good faith and to the best of its ability. In addition, we note that much of the work done in preparing the 208 Plan was also necessary to the development of the regional plan, specifically the establishment of the threshold carrying capacities required by the Compact.

However, it is primarily the agency's response to the amended Compact that, inevitably, set this litigation in motion. On February 26, 1981, TRPA adopted Ordinance 81–1, which elaborated on what was meant by the term "project," as defined in the Compact. The Compact defined "project" as "an activity undertaken by any person, including any public agency, if the activity may substantially affect the land, water, air, space or any other natural resources of the region"; required all "projects" to be approved by TRPA; and directed the agency to "prescribe by ordinance those activities which it has determined will not have a substantial effect on the land, water, air, space or any other natural resources in the region and therefore will be exempt from its review and approval." 1980 Compact, Article II(h), Article VI(a)-(b). In other words, TRPA was required to identify what were *not* projects. This TRPA did in Ordinance 81–1. In relevant part, 81–1 made clear that the construction of new, single-family homes in "critical areas" (defined to include Class 1–3 lands and SEZ lands) was considered a "project" (subject to a minor exception for certain already approved subdivisions). TRPA Ordinance 81–1, § 3 .12 (Defs.' Ex. 217). Thus Ordinance 81–1 made it clear that, for the most part, owners of Class 1–3 and SEZ lands were required to get a permit from TRPA before beginning construction of homes on their property.

Then, several months later, TRPA adopted Ordinance 81–5, the first of the three actions actually challenged in this case. The ordinance was enacted on June 25, 1981, with an effective date of August 24, 1981. TRPA

Ordinance 81–5, § 16.00 (Defs.' Ex. 227). Even the defendants have admitted that Ordinance 81–5 "temporarily prohibit[ed] most residential and all commercial construction on land capability districts 1, 2, 3 and SEZs until a new regional plan was developed." Defs.' Tr. Br. at 13. Ordinance 81–5 actually amended the existing regional plan, referred to by its implementing ordinance, Ordinance No. 79–10. First, Ordinance 81–5 amended § 12.00 of Ordinance 79–10, entitled "Regulation of Development on High–Erosion and High–Runoff Hazard Lands." The amended section 12.00 provided that land in capability districts 1 through 3 (excluding SEZ lands) would be subject to a classification review, which came to be known as "case-by-case" review. The amendments to § 12.00 went on to provide that:

> Except as otherwise provided by this ordinance, no person shall perform any construction, work, use or activity, including without limitation, grading, clearing, removal of vegetation, filling or creation of land coverage, upon land within land capability districts 1a, 1c, 2 and 3 without first obtaining a permit from the Agency. The application for such a permit shall be reviewed and approved as a "project" pursuant to the Compact and the Rules and Regulations of Practice and Procedure of the Agency....

TRPA Ordinance 81–5, § 2.20 (amending § 12.21 of Ordinance 79–10). Although specific findings were required for approval of any application that would result in land coverage in excess of the Bailey coefficients, such excess coverage was permitted. The coverage limitations in force were actually those set forth in § 9.24 of the Land Use Ordinance, or Ordinance No. 4 (Defs.' Ex. 201), or "twenty percent (20%) of the area of the pertinent lot or parcel, whichever is less." TRPA Ordinance 81–5, § 2.20 (amending § 12.23 of Ordinance 79–10). The coverage limitations of § 9.24 of Ordinance No. 4 were less restrictive than the Bailey coefficients. New commercial land coverage, on the other hand, was restricted to amounts consistent with the Bailey coefficients, at least in land capability districts 1–3 and SEZ lands. TRPA Ordinance 81–5, § 2.20 (amending § 12.40 of Ordinance 79–10). Further, § 12.60 was amended to read as follows:

> Except as otherwise provided by this ordinance, and subject to the exceptions set forth in this subsection, no person shall perform any grading, clearing, removal of vegetation, filling or creation of land coverage upon land within land capability districts 1a, 1c, 2 and 3.

TRPA Ordinance 81–5 (amending § 12.60 of Ordinance 79–10). The exceptions referred to included already approved subdivisions, public works projects, areas already so modified by man that the land capability characteristics had been fundamentally changed ("man-modified areas"), approved erosion control work, and "outdoor recreation facilities." Id. Finally, the amendment provided for administrative challenges to land capability district classifications.

As to SEZ lands, the amendments provided for much more strict prohibitions on development:

> Notwithstanding any other provision of this ordinance or of any other ordinance of the Agency, no person shall perform any grading, clearing, removal of vegetation, filling or creation of land coverage, within or upon a stream environment zone ("SEZ"), as described or depicted upon maps contained in the Plan.

TRPA Ordinance 81–5, § 3.00 (amending § 13.00 of Ordinance 79–10). Further,

> Notwithstanding any other provision of this ordinance or of any other ordinance of the Agency, no person shall perform any construction, work, use or activity upon a lot or parcel containing an SEZ without first obtaining a permit from the Agency, the application for which permit shall be reviewed and approved as a "project" .... Such application shall not be approved unless it is found by the Agency that it proposes no grading, clearing, removal of vegetation, filling or creation of land coverage within the SEZ ....

Id. The only exceptions for SEZ lands are for certain public works projects, man-modified areas, and approved erosion control work. Again, however, administrative challenges to a property's classification were allowed.

The other relevant provisions of Ordinance 81–5 deal with its applicability. On a first reading, the provisions of the ordinance that

allow for the possibility of some construction in Class 1-3 lands appear to apply to all land in the Basin. *See* TRPA Ordinance 81-5, § 10.00 (amending § 20.00 of Ordinance 79-10). However, § 20.20 of Ordinance 79-10 was amended to continue in effect certain listed provisions of the California State Water Resources Control Board's Lake Tahoe Water Quality Plan, with respect to the California side of the Basin. Those provisions essentially barred new development in California on SEZ lands-or anywhere in excess of the Bailey coefficients. Defs.' Ex. 211. The final provision of Ordinance 81-5 that concerns us now relates to its effect date, which was defined as sixty days after the date of its adoption. TRPA Ordinance 81-5, § 16.00. As the ordinance was adopted on June 25, 1981, it became effective on August 24, 1981.

The effect of Ordinance 81-5 as to SEZ lands was thus to prohibit any construction, work, use or activity that involved any form of grading, clearing, removal of vegetation, filling or creation of land coverage-with or without a permit. Uses or activities that did not involve grading, clearing, removal of vegetation, filling or creation of land coverage appear to have been allowed-if a permit was obtained. The plain language of the ordinance thus seems to imply that even hiking or picnicking on SEZ land in its natural state would require a permit, although it is hard to imagine that TRPA would have enforced the ordinance so literally. These restrictions appear to be effectively the same in both Nevada and California.

As to Class 1-3 lands, however, there is a significant difference between Nevada and California. In Nevada, the provisions of Ordinance 81-5 allowed for construction, work, uses or activities, including those that involved grading, clearing, removal of vegetation, filling or creation of land coverage-including land coverage in excess of the Bailey coefficients-so long as a permit was obtained. Permits for such activities were obtainable, provided that certain findings were made. In California, however, no coverage in excess of the Bailey coefficients was allowed. As on SEZ lands, however, the language of the ordinance indicates that *nothing* could be done without a permit. For Class 1-3 lands, however, this might have been somewhat

modified by Ordinance 81-1, which provided for "minor grading" without a permit.

After the adoption of 81-5, which also implemented some details of the final 208 plan, TRPA turned its attention more completely to the task of developing threshold carrying capacities as mandated by the Compact. From the date Ordinance 81-5 was adopted, TRPA had approximately one year remaining under the Compact's schedule in which to develop carrying capacities. "Environmental threshold carrying capacity" was defined by the 1980 Compact as "an environmental standard necessary to maintain a significant scenic, recreational, educational, scientific or natural value of the region or to maintain public health and safety within the region." 1980 Compact, Article II(i). Faced with a complex task and a divided Governing Board, it is unsurprising that TRPA did not quite meet the Compact deadline of June 19, 1982. Instead, threshold carrying capacities were adopted on August 26, 1982, roughly two months behind schedule-which, given the circumstances, was not terrible. TRPA Resolution No. 82-11 (Defs.' Ex. 244).

Under a liberal reading of the Compact, TRPA then had one year from the adoption of the thresholds in which to adopt a new regional plan-or until August 26, 1983. Unfortunately, but again not surprisingly, no regional plan was in place as of that date. Worried that, once the Compact's time limit had been exceeded, TRPA had no jurisdiction to continue issuing construction permits, the agency took the second of the three actions challenged here-it adopted Resolution 83-21, which completely suspended all project reviews and approvals, including the acceptance of new proposals, for a period of ninety days, or until November 26, 1983. TRPA Resolution 83-21 (Defs.' Ex. 275). Since a permit was required for almost any use of Class 1-3 or SEZ lands at all, this moratorium essentially prohibited the commencement of any new use of such land. At the end of ninety days, the ban was extended-although not by any affirmative action by TRPA, and not, contrary to what the defendants have implied, for any set period of time. The Minutes of the TRPA Governing Board regular meeting held November 17,

1983, indicate that TRPA staff members advised the Board that the end of the ninety day period was approaching, and that, absent an order by the Board to the contrary, the staff would continue to observe the moratorium, since the conditions that had led to its imposition in the first place still existed. Defs.' Ex. 286. That is, there was still no regional plan. Since the Board never took any action in response to this "advice," the moratorium was, in fact, continued in effect by the staff.

Finally, however, on April 26, 1984, a new regional plan was adopted. TRPA Ordinance 84–1 (Defs.' Ex. 299). The temporary moratorium initiated by Resolution 83–21 thus ended up lasting approximately eight months. With respect to Class 1–3 and SEZ properties, however, not much changed. The 1984 Plan provided, at least temporarily, that no projects proposing *any* land coverage at all in Class 1–3 and SEZ lands would be considered, with limited exceptions for "regional public facilities, public outdoor recreation facilities and public works projects." TRPA Ordinance 84–1, § 4.30(2) (Defs.' Ex. 299) (incorporating by reference the document entitled "Project Review Under Adopting Ordinance," dated March 28, 1984). This prohibition may or may not have been intended to become permanent, but the provisions relating to high hazard lands, as well as numerous other provisions, apparently still had not quite been agreed upon at the time Ordinance 84–1 was adopted, and temporary measures were enacted in the interim. *See, e.g.,* TRPA Ordinance 84–1, § 2.12 (the plan area statements were "adopted as an interim policy guideline, effective until September 1, 1984, unless otherwise provided ..."). As part of these temporary measures, the provisions of Ordinance 81–5 for approving projects were continued in force.

But no further refinements to the 1984 Plan were ever made. The very day that the new regional plan was adopted, the State of California filed suit against TRPA to block the plan's implementation. The next day, April 27, an environmental group known as the League to Save Lake Tahoe also filed suit. Both actions were filed in the Eastern District of California, and were assigned to Judge Edward J. Garcia. On May 1, 1984, Judge Garcia issued an Order to Show Cause

and Temporary Restraining Order, which prohibited TRPA from issuing any permits in the Tahoe Basin, or even accepting any new applications for permits. Order to Show Cause and Temporary Restraining Order at 3, No. Civ. S–84–0561 EJG (E.D.Cal. May 1, 1984) (Defs.' Ex. 300). The Order set a hearing date of May 31, 1984, for arguments regarding the issuance of a Preliminary Injunction. The hearing was eventually pushed back to June 11, but the Preliminary Injunction was granted-on June 15, 1984. *People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency,* No. Civ. S–84–0561 EJG, 1984 WL 6591 (E.D.Cal. June 15, 1984) (Defs.' Ex. 303). The court then issued its Order Granting Preliminary Injunction on August 9, 1984. Order Granting Prelim. Inj., No. Civ. S–84–0565 EJG (E.D.Cal. Aug.9, 1984) (Defs.' Ex. 314). The August 9 Order essentially adopted the terms of the T.R.O., except for the fact that a long list of specific exceptions (mostly for various government entities) was included. Eventually, the Preliminary Injunction was upheld by the Ninth Circuit. *People of State of Cal. ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency,* 766 F.2d 1308 (9th Cir. 1985). The injunction thus remained in force until a completely revised regional plan (the "1987 Plan") was adopted in 1987.

Also shortly after the 1984 Plan was adopted, on June 25, 1984, TRPA faced another legal challenge to the 1984 Plan-that is, the instant case. Or rather, cases. Originally, those plaintiffs owning property on the Nevada side of the Tahoe Basin filed suit in this Court, No. CV–N–84–257–ECR, and those plaintiffs owning property on the California side of the Basin filed an action in the Eastern District of California, which again was assigned to Judge Garcia, No. Civ. S–84–816 EJG. After proceeding separately for years, the California case was transferred to this Court, and the two actions were consolidated here. Order, No. CV–N–84–257–ECR (Feb. 21, 1992) (Doc. # 132). Initially, the complaints asserted claims against TRPA, the states of Nevada and California, and the individual members of TRPA's Governing Board, for declaratory and injunctive relief for due process and equal protection violations, and damages for violations of the tak-

ings clause. In addition, the complaint stated a claim for violations of the Civil Rights Act, 42 U.S.C. §§ 1983 and 1985, as well as what is commonly known as a *"Furey"* claim-that is, a claim that the plaintiffs had been forced to pay certain assessments on their land, but had not been able to enjoy the benefits of the public improvements those assessments funded (such as sewer service, etc.), since they were unable to build on their land. *Furey v. City of Sacramento*, 592 F.Supp. 463 (E.D.Cal.1984), *aff'd*, 780 F.2d 1448 (9th Cir.1986).

Both in the complaints and throughout this litigation, the plaintiffs have been grouped by "class," according to the land capability district of each plaintiff's land. "Class 1–3" plaintiffs and "SEZ" plaintiffs are grouped separately. Once the cases were consolidated, the plaintiffs were further grouped by state. Thus there are four groups of plaintiffs now before the Court: Nevada-side Class 1–3 plaintiffs; Nevada-side SEZ plaintiffs; California-side Class 1–3 plaintiffs; and California-side SEZ plaintiffs. The claims of these plaintiffs have also been divided-by time period, according to the effective dates of the various ordinances and other actions challenged herein: "Period I" covers August 24, 1981, to August 26, 1983; "Period II" covers August 27, 1983, to April 25, 1984; and "Period III" covers April 26, 1984, to July 1, 1987.

In the first round of district court decisions in the mid–1980s, both this Court and the Eastern District of California dismissed all of the plaintiffs' claims. *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 611 F.Supp. 110 (D.Nev. 1985); *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 638 F.Supp. 126 (D.Nev.1986); *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, Memorandum and Order, No. Civ. S–84–816 EJG (E.D.Cal. Jan. 22, 1985); *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, Memorandum of Decision and Order Granting Summ. J., No. Civ. S–84–816 EJG (E.D.Cal. Mar. 27, 1987). Both district courts were then reversed in part and affirmed in part by the Ninth Circuit. *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 911 F.2d 1331 (9th Cir.1990) (*"TSPC I"*) (reviewing the District of Nevada case); *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 938 F.2d 153 (9th Cir.1991) (*"TSPC II"*) (reviewing the Eastern District of California case).

In *TSPC I*, the Ninth Circuit held that all claims for declaratory and injunctive relief were moot, as the 1984 Plan had been replaced in the interim by the 1987 Plan. Further, all claims for money damages against Nevada and California were dismissed on immunity grounds. The court followed these holdings in *TSPC II*. In the Nevada case, the Ninth Circuit held that all of the plaintiffs' Period III takings and § 1983 claims against TRPA were unripe, and that the Period I takings and § 1983 claims of the Class 1–3 plaintiffs against TRPA were also unripe. In the California case, however, the Ninth Circuit held that all of the plaintiffs' takings and § 1983 claims against TRPA were ripe.

On remand, the cases were consolidated in this Court. We allowed the plaintiffs to amend their complaints, and in doing so, the plaintiffs added claims against the 1987 Regional Plan. We again dismissed all of the plaintiffs' claims: the Period I and Period II claims on statute of limitations grounds; the Period III claims for lack of causation; and the new claims against the 1987 Plan because they had not been properly joined, were unripe, and were time-barred. *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 808 F.Supp. 1474 (D.Nev. 1992) (Nevada case); *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 808 F.Supp. 1484 (D.Nev.1992) (California case). In addition, we dismissed the *Furey* claims, which had been remanded to us for a determination of whether any assessments had been paid to TRPA (as opposed to other local agencies), because we found that no such payments had in fact been made to TRPA.

Again, the Ninth Circuit reversed in part. *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 34 F.3d 753 (9th Cir.1994) (*"TSPC III"*), *amended by* 42 F.3d 1306 (9th Cir.1994). The court held that the plaintiffs' takings claims as to Periods I and II were barred by the statute of limitations, but that their § 1983 claims as to

the same periods were not time-barred. Further, the court held that the plaintiffs' § 1983 claims as to the 1987 Plan were not barred by the 60–day statute of limitations contained in the Compact. Finally, the court remanded the plaintiffs' Period III claims for the trier of fact to determine whether or not those claims were caused by the actions of TRPA.

Subsequent to the most recent remand, we held that the plaintiffs' § 1983 claims as to the 1987 Plan, while not barred by the 60–day Compact statute of limitations, were nonetheless barred by the appropriate § 1983 statutes of limitations in both Nevada and California. *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency,* 992 F.Supp. 1218 (D.Nev.1998). Thus the recent trial, held December 1–16, 1998, only addressed the following claims: the Period I § 1983 claims of all the California plaintiffs, as well as of the Nevada SEZ plaintiffs; the Period II § 1983 claims of all the plaintiffs; and the Period III claims of the California plaintiffs. (Although by now it is clear that the plaintiffs could not bring separate "takings" claims apart from their § 1983 claims, as to the 1984 Plan both sets of claims are technically still in the case. Nonetheless, separate relief for the two sets of claims is not available.)

Further, it should be noted that we had previously ordered the trial to be bifurcated into two phases: the first phase was to establish whether the plaintiffs were entitled to compensation for any of their claims; the second (to take place only if TRPA were found liable on any claims) was to determine how much compensation the plaintiffs were owed. The recent trial encompassed only the first phase.

At trial, several witnesses testified as to the scientific basis for the findings, discussed above, that the increase in impervious land coverage in the Basin, especially in high hazard lands, causes a corresponding increase in sediment runoff into the lake, and the subsequent eutrophication thereof. The testimony of Dr. Goldman was especially persuasive.

Dr. Goldman, one of the country's leading limnologists, has been studying Lake Tahoe for almost forty years, and has personally recorded data regarding its loss of clarity. In general, we find the scientific evidence presented by the defendants to be credible.

One area that was heavily contested at trial, however, involved the testimony of two expert witnesses, one called by each side, on the subject of appraising the value of high hazard lands during the period at issue, and whether a "competitive market" for such land existed between 1981–1987 or any portion thereof. Since the resolution of this question resolves one of the major issues in the case, we will discuss it in more detail together with our discussion of the legal questions involved, *infra.*

## CONCLUSIONS OF LAW

### I. REGULATORY TAKINGS

All of the remaining claims in this case were brought under 42 U.S.C. § 1983, alleging violations of the Takings Clause of the Fifth Amendment to the United States Constitution.[2] The Takings Clause provides as follows: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. Of course, the Takings Clause is applicable to the States through the Fourteenth Amendment. *Dolan v. City of Tigard,* 512 U.S. 374, 383, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994). Technically speaking, TRPA is not a state or even a subdivision of a state-it is a separate legal entity, created by the Compact. Compact, Article III(a). Nonetheless, TRPA is clearly liable for damages for such violations. *TSPC I,* 911 F.2d 1331, 1341 (9th Cir.1990).

The Takings Clause can be violated either by direct government appropriation of property without just compensation, or by government regulation that interferes with a property owner's use of her property to the extent that it accomplishes nearly the same result as a direct appropriation. *Lucas v.*

---

**2.** Actually, the plaintiffs' "pure" takings claims against TRPA as to the 1984 Plan have not technically been dismissed from the case, but it is clear by now that all claims against government actors for constitutional violations must be brought under 42 U.S.C. § 1983. *Azul–Pacifico, Inc. v. Los Angeles,* 973 F.2d 704, 705 (9th Cir. 1992). There is no separate relief available for a "pure" takings claim.

*South Carolina Coastal Council,* 505 U.S. 1003, 1014, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). "[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922).

### A. Do TRPA's Actions "Substantially Advance a Legitimate State Interest"?

 The instant case does not involve any allegations of direct appropriations of land by TRPA. All of the claims are of the "regulatory takings" variety. Government regulation will constitute a taking when either: (1) it does not substantially advance a legitimate state interest; or (2) it denies the owner economically viable use of her land. *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980).

As to the first of these possibilities, there is as yet no clear test for determining whether a regulation substantially advances a legitimate state interest-at least in the type of situation involved here. First, though, it is clear that the "interest" being advanced must be "legitimate." We suppose an argument could conceivably be made that preventing the eutrophication of Lake Tahoe is not a legitimate interest for the government to pursue at all, but no one in this case has made that argument. Nor do we think that such an argument would ever be successful. Besides the intrinsic value of preserving the environment from degradation and destruction, the beauty of Lake Tahoe is largely responsible for driving the economy of the region, which is based almost entirely on tourism. Thus the main question to be resolved here is not whether the state interest is "legitimate," but whether TRPA's actions "substantially advanced" that interest.

The Supreme Court has developed a test to make this determination in its "unconstitutional exactions" cases, *Dolan v. City of Tigard* and *Nollan v. California Coastal Comm'n*-the "essential nexus"/"rough proportionality" test. That is, first it must be determined "whether the 'essential nexus' exists between the 'legitimate state interest' and the permit condition exacted by the city," *Dolan,* 512 U.S. at 386, 114 S.Ct. 2309 (citing *Nollan,* 483 U.S. 825, 837, 107 S.Ct.

3141, 97 L.Ed.2d 677 (1987)), and then whether some "rough proportionality" exists between the condition exacted and the "impact of the proposed development." *Id.* at 390–91, 114 S.Ct. 2309. Aside from one footnote in *Dolan,* these cases do not really indicate whether this test should also be applied to situations in which no concession is being sought by the government in return for the grant of a permit to a specific individual. The relevant footnote states only the following: while in regard to individualized, adjudicative, permit conditions the burden of proof is on the government, "in evaluating most generally applicable zoning regulations, the burden is on the party challenging the regulation to prove that it constitutes an arbitrary regulation of property rights." *Id.* at 391 n. 8, 114 S.Ct. 2309.

However, the Ninth Circuit has indicated that this test may not be limited to cases involving exactions. In *Del Monte Dunes at Monterey, Ltd. v. City of Monterey,* 95 F.3d 1422 (1996) ("*Del Monte Dunes*"), *reh'g granted,* 118 F.3d 660, *reh'g en banc denied,* 127 F.3d 1149 (9th Cir.1997), *cert. granted,* ––– U.S. –––, 118 S.Ct. 1359, 140 L.Ed.2d 509 (1998), the court applied the "rough proportionality" test to a case in which nothing was exacted-the permit was simply denied. *Id.* at 1430 (holding that "[s]ignificant evidence supports Del Monte's claim that the City's actions were disproportional to both the nature and extent of the impact of the proposed development"). More recently, though, the court held that the *Dolan/Nollan* analytical framework does not apply at all to *facial* challenges such as this one. *Garneau v. City of Seattle,* 147 F.3d 802, 811 (9th Cir.1998). Unfortunately, however, there is no majority opinion in *Garneau,* so the case is of limited precedential value. If *Garneau* is correct, then the "rough proportionality" test would not apply here-but there is no indication of what other test should then be applied instead.

 Given that any other possible test would most likely be less stringent than the rough proportionality test (such as, perhaps, the *Dolan* footnote's statement that the regulation must not be "arbitrary"), it seems clear that TRPA's actions do "substantially ad-

vance a legitimate state interest." For the actions in question satisfy even the rough proportionality test. The evidence is quite convincing that further development on high hazard lands such as the plaintiffs' would lead to significant additional damage to the lake. Thus, limiting such development unquestionably satisfies the "essential nexus" part of the test. There is a direct connection between the potential development of plaintiffs' lands and the harm the lake would suffer as a result thereof. Further, there has been no suggestion by the plaintiffs that any less severe response would have adequately addressed the problems the lake was facing. Thus it is difficult to see how a more proportional response could have been adopted. Given that TRPA's actions had wide-spread application, and were not aimed at an individual landowner, the plaintiffs would appear to bear the burden of proof on this point. *Dolan*, 512 U.S. at 391 n. 8, 114 S.Ct. 2309. They have not met this burden-nor have they really attempted to do so. Although unwilling to *stipulate* to the fact that TRPA's actions substantially advanced a legitimate state interest, the plaintiffs did not seriously contest the matter at trial.

### B. Do TRPA's Actions Deny the Plaintiffs "Economically Viable Use" of Their Property?

■ As the challenged actions of TRPA therefore clearly do "substantially advance legitimate state interests," the question to be answered next is whether those actions deprived the plaintiffs of "economically viable use" of their property. If TRPA's actions deprived the plaintiffs of *all* economically viable use of their land, as opposed to just *some* such use, then those actions would constitute what have been referred to as "categorical" takings, with no further inquiry necessary.[3] *Lucas*, 505 U.S. at 1015, 112 S.Ct. 2886. On the other hand, if TRPA's actions deprived the plaintiffs of *some*, but not *all*, economically viable use of their land, then TRPA's actions must be analyzed under the "essentially ad hoc, factual inquir[y]" of *Penn*

*Central Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) ("*Penn Central*"). Under the *Penn Central* test, a regulation may or may not effect a taking, depending on: (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct, investment-backed expectations"; and (3) "the character of the governmental action." *Id.*

At least one of these "tests" will apply, however-that is, either the *Lucas* "categorical takings" rule, or the *Penn Central* ad hoc balancing test. In other words, it is clear that TRPA's actions did deny the plaintiffs at least some economically viable uses of their land. The question which remains to be answered-and which was hotly debated at trial-is whether the denial was total, or only partial. This question is important because the answer effectively decides the outcome of the case.

### 1. Did TRPA's Actions Effect a "Partial Taking" of the Plaintiffs' Property?

■ If we were to hold that TRPA's actions effected only a partial denial of economically viable use, then consideration of the *Penn Central* factors clearly leads to the conclusion that there was no taking. Given the temporary nature of the regulations at issue here, we cannot say that the plaintiffs' reasonable, investment-backed expectations were unduly interfered with. *Dodd v. Hood River County*, 136 F.3d 1219, 1230 (9th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 278, 142 L.Ed.2d 229 (1998). Mr. Johnson, the defendants' appraiser, testified that the average holding time of a lot in the Tahoe area between lot purchase and home construction is twenty-five years. If the average purchaser expects to hold a lot for twenty-five years before building on it, then a delay of six years in being able to build would not be an interference with that purchaser's expectations at all. We recognize, of course, that some of the individual plaintiffs herein may

---

**3.** Of course, this sort of categorical treatment is also accorded to regulations which require a property owner to suffer actual physical invasion of her land. *Lucas*, 505 U.S. at 1015, 112 S.Ct. 2886. This is true no matter how minute that

invasion may be. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). However, no such physical invasion is alleged to have occurred here.

conceivably have held their properties for almost twenty-five years by the time the restrictions on construction at issue were imposed, or may have intended to build immediately. We have no way of knowing this, since no information regarding any of the individual plaintiffs was presented at trial. Thus we must rely on testimony as to the "average" purchaser's intent. Besides, the fact that some plaintiffs may have already held their property for a long period of time would not exactly weigh in their favor. It would certainly show that they did not intend to build immediately upon purchase. Further, they would have had plenty of time to build before the restrictions went into effect-and almost everyone in the Tahoe Basin knew in the late 1970s that a crackdown on development was in the works. The Tahoe area experienced a glut of construction in the years just before the Compact was amended in 1980, as worried property owners attempted to build while they still could. On the other hand, if some individual plaintiffs in this action acquired their property more recently than twenty-five years before the restrictions were imposed, then their expected holding time may not have been affected at all.

The facts were somewhat similar in *Dodd*, in which the Ninth Circuit found that the plaintiffs' reasonable, investment-backed expectations had not been interfered with. In *Dodd*, the plaintiffs had purchased land in 1984, but waited until 1990 to file for the necessary permit to build. For six more years, it appeared that no such permit would be granted, but in 1996 it was. However, the plaintiffs had still not commenced building by 1998, when the Ninth Circuit heard their case. The court found that the self-imposed delay in building their retirement home weighed heavily against the idea that their reasonable, investment-backed expectations had been foiled by the six-year delay they suffered as a result of the permit process. *Dodd*, 136 F.3d at 1230. Thus, we hold that, like the plaintiffs in *Dodd*, the plaintiffs in our case did not have reasonable, investment-backed expectations that they would be able to build single-family homes on their land within the six-year period involved in this lawsuit. This factor therefore weighs against

a finding that TRPA's action effected a partial taking of the plaintiffs' property.

The fact that no information on individual plaintiffs was introduced at trial also affects our ability to analyze the first of the *Penn Central* factors-that is, the economic impact of TRPA's actions on the plaintiffs. Since the burden is on the plaintiffs to show that a taking occurred (and since that burden is especially heavy in a facial challenge such as this), the fact that they agreed not to introduce this type of evidence works against them. The fact that it is a facial challenge does not mean that all evidence relating to individual plaintiffs is irrelevant at this stage. *See Garneau*, 147 F.3d at 807–08 (engaging in "ad hoc, factual inquiry appropriate in non-categorical regulatory takings cases" in acknowledged "facial" case). It may be that the instant plaintiffs could have produced evidence of this type, but they clearly chose not to do so. We assume that this was a result of a calculated choice by plaintiffs' counsel to concentrate on the plaintiffs' main contention, that TRPA's actions resulted in a categorical taking, and not a partial taking. Regardless, the fact that no evidence was introduced regarding the specific diminution in value of any of the plaintiffs' individual properties clearly weighs against a finding that there was a partial taking of the plaintiffs' property.

The third of the *Penn Central* factors, that of "the character of the governmental action," also weighs against a finding that there was a partial taking of the plaintiffs' property. As discussed above, the scientific evidence convincingly shows that Lake Tahoe was losing its clarity due to increased development in the Basin, especially in high hazard lands. Thus limiting development on high hazard lands is a direct and reasonable way to combat the problem. Faced with the responsibility for solving a serious problem, TRPA took the necessary steps to do so. While those steps may have had a more substantial impact on the plaintiffs than on others in the Basin, the plaintiffs were not completely deprived of their land, and they retained many important rights of property ownership, such as the right to exclude others from their own land. *See Penn Central*,

438 U.S. at 124, 98 S.Ct. 2646 ("A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government [citation omitted], than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.").

■■ Thus with all three of the *Penn Central* factors, at least to some extent, weighing against a finding that TRPA's actions constituted a partial taking, we clearly must hold that anything less than a total denial of all economically viable use of the plaintiffs' property would not constitute a taking. Since the *Penn Central* test is essentially a balancing test-"a weighing of private and public interests," *Dodd*, 136 F.3d at 1229 (citing *Agins*, 447 U.S. at 261, 100 S.Ct. 2138)-and since the interest in protecting Lake Tahoe is so strong, any test that takes that interest into account would result in victory for the defendants. However, if the plaintiffs were deprived of all economically viable use of their property, then the interest in protecting Lake Tahoe is not taken into account. No matter how noble the goal of protecting the lake, and no matter how necessary the steps taken were to achieving that goal, the plaintiffs would be entitled to just compensation from TRPA. "It is axiomatic that the Fifth Amendment's just compensation provision is 'designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " *First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482 U.S. 304, 318–319, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) (*"First English "*) (quoting *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)).

### 2. Did TRPA's Actions Effect a "Total Taking" of the Plaintiffs' Property?

The most important question we must decide, then, is whether the plaintiffs have indeed been deprived of all economically viable use of their land. Thus, we must first decide *how* to answer that question. At trial, the defendants argued, essentially, that property that has been deprived of all economically viable use will be rendered completely "valueless," so that property with any remaining

value, by definition, must have some remaining economically viable use. The plaintiffs, on the other hand, argued that the "value" of property is utterly irrelevant to the determination of whether any viable uses of that property remain, and even moved to exclude all evidence of value at trial. Pls.' Mot. in Limine (Oct. 30, 1998) (Doc. # 289). Both of these contentions are meritless. "Value" is unquestionably relevant to the issue of whether there has been a taking. The Ninth Circuit explicitly recognized this in *Del Monte Dunes*, 95 F.3d at 1433. The only case to which the plaintiffs point for support of their argument that "value" is irrelevant is *Lucas*, which certainly does contain language stressing the importance of "use." But *Lucas* clearly relied on the lower court's finding that the regulations at issue had in fact rendered the plaintiff's property "valueless." *Lucas*, 505 U.S. at 1020 n. 9, 112 S.Ct. 2886. Thus *Lucas* could just as easily be read to support the defendants' contention that value is "everything" as the plaintiffs' contention that value is "nothing ." In truth, however, *Lucas* supports neither of these extremes. It was clearly important to the Court that the property had been rendered "valueless"; likewise, however, it was also important that Lucas could not "use" his property in any "economically beneficial or productive" fashion. *Lucas*, 505 U.S. at 1015, 112 S.Ct. 2886. In any event, regardless of how *Lucas* could be read, the Ninth Circuit has essentially resolved the issue for us. In *Del Monte Dunes*, the court explicitly held that value, while clearly relevant, was not the main focus of the economically viable use inquiry. *Del Monte Dunes*, 95 F.3d at 1433. The court further held that proof that a property retains some value is not sufficient to prove that the property retains some economically viable use. *Id.* at 1432–33.

This holding is key to our case, because it is clear that the plaintiffs' properties-no matter how restricted their use-did retain some value during the period at issue. The defendants' appraiser, Mr. Johnson, testified to the fact that during the period at issue, some sales of Class 1–3 and SEZ properties did take place. Further, his testimony supports the proposition that all land in the Tahoe Basin has, and has always had, *some* value,

no matter how limited its uses. In some instances that value may be minimal, but none of the land is completely "valueless," as was the case in *Lucas.*

■ As we have seen, however, the fact that the land had some value is not sufficient. The land must retain some "economically beneficial or productive use." Of course, there is some connection between the two concepts. To a large extent, land will only have significant value if there is some use to which it can be put-for as the Supreme Court has recognized, "[w]hat is the land but the profits thereof?" *Lucas,* 505 U.S. at 1017, 112 S.Ct. 2886 (citations omitted). As for what constitutes an economically "viable," "beneficial," or "productive" use, the Ninth Circuit has held that a "use" of property is economically viable when a competitive market exists for the property as subject to the use restrictions imposed by the regulations at issue. *Del Monte Dunes,* 95 F.3d at 1433. That is, a permitted use is economically viable when a sufficient number of people would be willing to buy the property for that use, whatever it might be, to make the property "commercially marketable." *Id.* at 1434. The fact that the permitted use might not be the one to which the current owner wanted to put the property does not matter. *See Dodd,* 136 F.3d at 1228–30 (fact that property could be used for "timber production" was considered economically viable use, even though the plaintiffs wanted to build a retirement home). As long as there is some type of competitive market for the land for its permitted use, than the use would appear to be an "economically viable" one.

■ However, if there is only one willing buyer, there would not, by definition, appear to be a "competitive" market. *See Del Monte Dunes,* 95 F.3d at 1432–33. Thus the fact that someone, such as the government or an environmental group, may be willing to pay for land that can only be "used" in its natural state does not necessarily mean that the "use" of leaving the property in its natural state is an "economically viable" one.

It is important, therefore, to determine just what "uses," if any, the plaintiffs could make of their property, as well as whether any of those uses were economically viable-i.e., whether a competitive market existed for

the land if put to that use. At trial, therefore, a substantial amount of time was spent examining the potential uses to which the plaintiffs' land could or could not have been put under the regulatory system in place in the Basin during the time periods at issue. To this end, the parties discussed houses, toolsheds, vegetable gardens, dog runs, kennels, corrals, barns, hiking trails, parking lots, greenhouses, driveways, treehouses, gazebos, tennis courts, swimming pools, golf courses, picnic facilities, camp grounds, farms, pumpkin patches, berry fields, other small agricultural endeavors, boat repair and storage facilities, jungle gyms, soccer fields, baseball diamonds, timber production, and a variety of other "uses" to which land in general, and the plaintiffs' land in particular, could conceivably be put. Whether any of these uses were permissible at all depends largely on the wording of TRPA's ordinances.

### a. Did Ordinance 81–5 Deprive the Plaintiffs of *All* Economically Viable Uses of Their Property?

First, under 81–5, no use or activity could be conducted on SEZ lands without a permit, and no permit would be granted if the proposed activity involved grading, clearing, removal of vegetation, filling or creation of land coverage. Of the uses listed above, very few would appear to be possible without involving some clearing, grading, removal of vegetation, etc. Unlike Class 1–3 property owners, SEZ owners could not avail themselves even of the exemption for "minor grading" provided in Ordinance 81–1. TRPA Ordinance 81–1, §§ 2.00, 3.8(1). It does appear that a few "uses" may have been available to SEZ owners, but it is highly doubtful that any of these uses could ever be considered economically viable.

Nonetheless, we have considered the evidenced offered by the defendants to prove that such uses were in fact economically viable-that is, the testimony of Mr. Johnson. Mr. Johnson, a respected appraiser with a practice based in the Tahoe Basin, testified that sales of SEZ property did take place during the period at issue. Specifically, he referred to six sales and one offer in a period

stretching from June 11, 1981, to January 5, 1990. One of these took place shortly before Ordinance 81–5 was enacted; another sale, as well as the offer, took place within the period of time 81–5 was effective. *See* Defs.' Ex. 82. He further testified that this sampling of sales was only "representative," and that in his opinion other sales of SEZ lands probably occurred in that time frame. Unfortunately, we cannot conclude that one actual sale, even if considered "representative," demonstrates that a "competitive market" for such land existed, as the Ninth Circuit requires-especially given that somewhere in the neighborhood of 8000 to 9000 undeveloped lots existed in the Basin at the time. Mr. Johnson's testimony also supports the idea that, if there were sales, almost all of them were probably to a neighbor looking to protect a view, or enlarge his own lot, or for similar reasons. If the only potential purchaser of a given lot is a neighbor, that does not necessarily suggest a "competitive" market. A single purchaser will not usually have any "competition" for the land. Even the sales of which there is evidence seem generally to have been made for relatively low prices, which also suggests that demand for such properties was extremely low.

As for Class 1–3 properties, the analysis is similar, although only California properties are still at issue with respect to Ordinance 81–5. The claims of the Nevada-side Class 1–3 plaintiffs as to Ordinance 81–5 were dismissed by this Court as unripe in 1986, *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 638 F.Supp. 126, 133 (D.Nev.1986), due to the existence of the so-called "case-by-case" exception. The dismissal of these claims was upheld by the Ninth Circuit in *TSPC I*, 911 F.2d 1331, 1339 (9th Cir.1990). Mr. Johnson testified that there were sales of Class 1–3 properties in California during the relevant time period, but again could only point to a few examples. Defs.' Ex. 78a. In fact, none of the offered examples actually occurred during the period Ordinance 81–5 was in effect, although two of them took place in the months prior to its enactment. Since the Ordinance 81–5 provisions as to California land actually went into effect on an earlier date in California, the effect is no doubt the same. Again, however, those few sales do not convince us that a competitive market for such land existed.

It is true that more "uses" were permissible for Class 1–3 properties, even in California, than for SEZ properties generally. These uses included "outdoor recreation facilities," and uses involving "minor grading"—provided no land coverage in excess of the Bailey coefficients was created. Thus while a few more uses, such as a garden, may have been permissible and even feasible, they do not appear to be any more "economically viable" than those permitted even on SEZ lands, such as hiking. While in theory some "outdoor recreation facilities" might be economically viable in certain conditions, we have assumed throughout this litigation that those conditions are not present on the plaintiffs' lands. For instance, golf courses, ski facilities, and even campgrounds may sometimes be quite profitable-but not on a lot intended for the building of a single-family home, surrounded by lots on which other single-family homes have already been built. We have been led to assume throughout this case that the plaintiffs all own single-family lots that would not be capable of supporting uses such as golf courses, ski facilities, or campgrounds (even assuming such facilities could be built without exceeding the coverage limitations). An average-size, single-family lot, at around 10,000 square feet, just is not large enough for any of these activities. We note, however, that some plaintiffs do own more than one lot. Should it prove to be true that any plaintiff owns two or more *contiguous* lots which together might be suitable for any "economically viable" "outdoor recreation facility"-type uses, we would need to reexamine this issue with respect to those plaintiffs. The fact that a plaintiff may own two or more *non*-contiguous lots is irrelevant—each lot is considered separately. Only lots that might be combined to form one, larger lot will be subject to any possible reconsideration on this point. In addition, we note that we have also always assumed that none of the plaintiffs' land was in either "approved subdivisions" or "man-modified areas," either of which would, if true for an individual plaintiff, make that plaintiff unable to prove that Ordinance 81–5, on its face, effected a taking of her property.

██ Thus, we are forced to conclude that Ordinance 81–5 did in fact deny the plaintiffs all economically viable use of their land. Unless the defendants prevail on one of the two "affirmative defenses" they have advanced, which will be discussed below, it is clear that Ordinance 81–5 effected a taking of the plaintiffs' property, and that the plaintiffs are therefore entitled to compensation for the period between August 24, 1981, and August 26, 1983. That is, those plaintiffs whose Period 1 claims have not already been dismissed are entitled to compensation for this period. Those plaintiffs owning Class 1, 2, or 3 land on the Nevada side of the Tahoe Basin are not entitled to compensation for this period. All other plaintiffs-i.e., Nevada-side SEZ plaintiffs and California-side Class 1, 2, 3, and SEZ plaintiffs-are entitled to compensation-assuming, of course, that none of these plaintiffs own two or more contiguous lots capable of being combined into a useful larger lot, or lots in "man-modified areas," or "approved subdivisions." Therefore, when we reach the damages phase of the trial, the defendants will be allowed to present evidence going to show that these assumptions are not valid with respect to any individual plaintiffs' lot.

### b. Did Resolution 83–21 Deprive the Plaintiffs of *All* Economically Viable Use of Their Property?

██ During the second time period, under Resolution 83–21, uses were even more restricted. Resolution 83–21 suspended all permit approvals-and it appears that basically any use of either Class 1–3 or SEZ lands required a permit. Without permits, therefore, no uses were really permissible. It is possible that Class 1–3 owners might have been able to conduct some "minor grading" on their property without getting a permit, since Ordinance 81–1 had defined "minor grading" as "not a project." TRPA Ordinance 81–1, §§ 2.00, 3.80(1). However, as discussed above, there is no evidence that the ability to conduct "minor grading" would have enabled the plaintiffs to "use" their property for anything much more "economically beneficial" than if they were not allowed to conduct minor grading. The evidence does not support a finding that there was a competitive market for high hazard land while 83–21 was in force. Again, therefore, we are forced to conclude that Resolution 83–21 denied the plaintiffs all economically viable use of their land. Barring success by the defendants in either their "nuisance" or "temporary takings" arguments, Resolution 83–21 is a taking, and the plaintiffs are entitled to compensation for the period from August 27, 1983, to April 25, 1984. For this period, all plaintiffs, on both sides of the Basin, are entitled to compensation.

### c. Did the 1984 Plan Deprive the Plaintiffs of All Economically Viable Use of Their Property?

The foregoing analysis assumes, of course, that TRPA's actions actually *caused* the plaintiffs' injuries. With respect to Ordinances 81–5 and Resolution 83–21, no one ever challenged that this was indeed the case. Nor could they-it is clear that TRPA's actions were the cause of the plaintiffs' damages. In fact, in most regulatory takings cases, there is never any doubt about whether the government's actions caused the plaintiff's injuries. With respect to the third and final of TRPA's actions challenged here, however, the issue of causation has been hotly debated. The defendants claim that, with respect to the 1984 Plan, the plaintiffs' injuries were actually caused by the injunction issued by Judge Garcia in the litigation brought by the state of California and the League to Save Lake Tahoe.

There is very little discussion of the "causation" issue in any of the case law involving regulatory takings. However, it is clear that the cases implicitly assume that the challenged government action must be both the cause in fact and the proximate cause of the plaintiff's injuries. In addition to the few regulatory takings cases that do explicitly reflect this view, this is also supported by other (i.e., non-regulatory) takings cases, and by other types of § 1983 cases.

First, in *Penn Central*, the Supreme Court mentioned almost in passing that "whether a particular restriction will be rendered invalid by the government's failure to pay for any losses *proximately caused* by it depends largely 'upon the particular circumstances [in that] case.'" 438 U.S. at 124, 98 S.Ct. 2646

(quoting *United States v. Central Eureka Mining Co.*, 357 U.S. 155, 168, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958)) (emphasis added) (alteration in original). The Court of Federal Claims has held that the "burden of plaintiff is to show that 'but for' the federal government's action they would have been able to realize their plans for the property allegedly taken." *Bowles v. United States*, 31 Fed. Cl. 37, 49 (1994). Earlier, the Claims Court had held that "[b]efore a court will find a compensable taking, it must be additionally satisfied that 1) plaintiff's loss was directly and proximately caused by governmental action." *Johns–Manville Corp. v. United States*, 12 Cl.Ct. 1, 34 (1987). Cf. *Wheeler v. City of Pleasant Grove*, 833 F.2d 267, 269 (11th Cir. 1987) (reversing district court's decision that "the implementation of Ordinance No. 216 had not proximately caused any compensable injury to the plaintiffs").

Further, in one specific line of non-regulatory takings cases, involving flooding caused by federal government action in making improvements to navigable waters, several courts have explicitly held that the government action must be the "direct and proximate cause" of the property owner's damages in order to constitute a taking. *E.g., Loesch v. United States*, 227 Ct.Cl. 34, 645 F.2d 905, 913 (1981) (holding that "if there is no proper showing that governmental action was the proximate and direct cause of the erosion damage, there can be no liability for a fifth amendment taking"); *Rhoads v. United States*, 6 Cl.Ct. 278, 279–80 (1984), *aff'd mem*, 770 F.2d 182 (Fed.Cir.1985) (holding that "[p]laintiffs must prove by a preponderance of the evidence that the construction and operation of the navigation dam in issue were the direct and proximate cause of the erosion damages suffered by them on their riparian banks").

Finally, other § 1983 cases unquestionably hold that causation is an element of the claim. *Arnold v. IBM Corp.*, 637 F.2d 1350, 1355 (9th Cir.1981):

Causation is a concept that is not often discussed or explicitly stated in civil rights cases.... Although causation is not stated explicitly in these formulations, it is an implicit requirement....

The causation requirement of sections 1983 and 1985 is not satisfied by a showing of mere causation in fact.... Rather, the plaintiff must establish proximate or legal causation....

... The standard for causation ... is more than that of causation in fact. [It] closely resembles the standard "foreseeability" formulation of proximate cause....

*Id.* See also, *Coral Constr. Co. v. King County*, 941 F.2d 910, 926 (9th Cir.1991) (holding that "like section 1983, section 1981 is by nature a tort remedy.... Accordingly, it follows that causation is also an element of a section 1981 cause of action."); *Wright v. City of Reno*, 533 F.Supp. 58, 64 (D.Nev. 1981) (stating that the "causation requirement, of both §§ 1983 and 1985, is not satisfied by a showing of mere causation in fact; rather, the plaintiff must establish proximate or legal causation"). Only one case seems to have addressed the issue in the context of a takings claim brought as a § 1983 claim: "To establish a takings claim under 42 U.S.C. § 1983, [the plaintiff] must show (1) a property interest; (2) that has been taken under the color of state law; (3) without just compensation. [citation omitted]. In addition, in order for liability to attach to a municipality, such as the County, a plaintiff must show that it was an official policy or custom or practice that *proximately caused* the constitutional violation." *HBP Assocs. v. Marsh*, 893 F.Supp. 271, 277 (S.D.N.Y.1995) (emphasis added).

However, while it is clear that TRPA's actions must have been the "proximate cause" of the plaintiffs' damages in order for liability to attach, it is not clear just what constitutes "proximate cause." Tort claims are generally governed by state law, not federal, but that cannot be true here, since we are actually faced with a question of federal constitutional law. There is no real federal law of torts, and even if there were, it would not necessarily apply. The issue here is not really analogous to a negligence claim at all. First, both TRPA and Judge Garcia acted intentionally, not negligently—but obviously neither acted maliciously or with criminal intent, so common-law intentional torts are not strictly analogous either. One common test is the "but for" test, which the

Court of Federal Claims seems to have adopted in the takings area. *Bowles,* 31 Fed. Cl. at 49. If we adopt the Court of Federal Claims' formulation—that is, that the plaintiffs must prove that "but for" TRPA's action they would have been able to develop their property—then TRPA clearly did not cause the plaintiffs' injuries, at least with regard to any harm they may have suffered after May 1, 1984. The 1984 Plan, as enacted, was not strict enough for California, the League to Save Lake Tahoe, Judge Garcia, or the Ninth Circuit. Clearly, had TRPA enacted a less stringent plan—i.e., one that allowed the plaintiffs to build on their Class 1–3 and SEZ properties—the injunction would still have issued barring TRPA from granting any permits or even accepting any applications.

■ It has often been stated in regulatory takings cases involving temporary takings that the government retains a choice once a regulation has been proven to effect a taking—either to retain the regulation in force and pay just compensation for the total value of the property, or to repeal the regulation and only face damages for the temporary period in which the regulation was enforced. The Supreme Court has been careful not to allow property owners to be able to "force" the government to exercise its power of eminent domain. *First English,* 482 U.S. at 317, 107 S.Ct. 2378 ("The Court has recognized in more than one case that the government may elect to abandon its intrusion or discontinue regulations. [citations omitted]. Similarly, a governmental body may acquiesce in a judicial declaration that one of its ordinances has effected an unconstitutional taking of property; the landowner has no right under the Just Compensation Clause to insist that a "temporary" taking be deemed a permanent taking."). In a sense, that is exactly what the injunction did in this case. Of course, the injunction ultimately proved temporary as well, but it deprived TRPA of the ability to change its mind, so to speak, in the interim, and allow the plaintiffs to begin building. In addition, there is language in Ordinance 84–1 that suggests that, at least with respect to Class 1–3 lands, the agency might eventually develop a screening system that would allow some of those property owners to build. TRPA Ordinance 84–1, § 1.24. With the injunction in place, however, TRPA would not

have been able effectively to amend the Plan to include such a screening system, and thus end its "temporary taking," at least with respect to some plaintiffs. Especially given the uphill battle that the plaintiffs face in proving a facial takings claims, *Suitum v. Tahoe Reg'l Planning Agency,* 520 U.S. 725, 736 n. 10, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997), the plaintiffs have not shown that the 1984 Plan was actually the cause of the damages they may have suffered from April 26, 1984, to July 1, 1987.

Once the 1984 Plan was adopted, 81–5 and 83–21 were superseded and could cause no damages to plaintiffs. The fact the 1984 Plan may have incorporated some of the prohibitions of 81–5 and 83–21 makes no difference. The 1984 Plan was adopted as an independent, free-standing ordinance, replacing the prior ordinances and resolutions in their entirety.

The real cause of plaintiffs' harm after the T.R.O. was entered was the effect of the T.R.O. and the Preliminary Injunction, not the 1984 Plan. The 1984 Plan was for all practical purposes suspended by the T.R.O. and the Preliminary Injunction. The escape mechanisms of the 1984 Plan were nullified. No one could file an application, have an application processed, or receive a permit, notwithstanding whatever land classification was involved. Class 1, 2, 3, and SEZ classifications became irrelevant to whether a person could obtain a permit for the use of her land. The reason a permit could not be obtained was the T.R.O. and the Preliminary Injunction, not the 1984 Plan.

The 1984 Plan had no further consequences to anyone after the T.R .O. and the Preliminary Injunction were issued; these orders blocked issuance of permits for whatever reason, unless exempted specifically by them. The T.R.O. and Preliminary Injunction did not allow the 1984 Plan to go into effect, and after they were entered, the 1984 Plan could no longer inflict harm on plaintiffs because it was not the reason plaintiffs were unable to use their lands. The reason there could be no development of plaintiffs' lands was the T.R.O. and the Preliminary Injunction.

At trial, the parties focused primarily on the "foreseeability" question—that is, whether TRPA foresaw or should have foreseen that the injunction would issue. It does seem possible that TRPA may have foreseen that it would be sued. However, it does not necessarily follow that it was foreseeable that the injunction would be granted. Contrary to the plaintiffs' assertions, TRPA was reasonable and acted in good faith in attempting to comply with the Compact. There is no evidence whatsoever to support the plaintiffs' theory that TRPA secretly wanted an injunction against all construction in the Basin, and deliberately passed a deficient regional plan in order to provoke a lawsuit and, subsequently, an injunction. In addition, TRPA had been advised by its attorneys that it had legislative discretion, which would be given great deference by the courts. TRPA would therefore not necessarily have had any reason to believe that it would lose and be enjoined. TRPA clearly fought the injunction vigorously.

For the foregoing reasons, therefore, we find that none of the plaintiffs are entitled to compensation from the defendants for the period between April 26, 1984, and July 1, 1987. For future reference, we note here that this holding really only affects the California plaintiffs—the Nevada plaintiffs' claims as to this period were dismissed long ago. *TSPC I*, 911 F.2d at 1339. We recognize that *TSPC II* did not follow the holding in *TSPC I*, since there was no majority opinion in *TSPC I* as to why the dismissal of those particular claims was being upheld—Judge Reinhardt (writing for the court in a "per curiam" opinion) felt that the 1984 Plan claims were unripe, while Judge Fletcher felt that they should be dismissed because of the causation issue. Judge Kozinski, meanwhile, dissented on this point. Nonetheless, the dismissal of these claims is the law of the case. We recognized this in our 1992 order, *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 808 F.Supp. 1474, 1477–78 (D.Nev.1992), and nothing has changed since then.

## II. AFFIRMATIVE DEFENSES

As mentioned above, the defendants also claim that, notwithstanding the fact that some of TRPA's actions may have resulted in the complete denial of all economically viable use of the plaintiffs' property, those actions nonetheless should not be considered takings. First, the defendants argue that, since Ordinance 81–5 and Resolution 83–21 were always intended merely as temporary measures, not permanent solutions, they are not takings. Second, the defendants argue that the harm they were trying to prevent—that is, the eutrophication of Lake Tahoe—constitutes a "nuisance" under preexisting California and Nevada law, and thus falls within the "nuisance exception" discussed in *Lucas*. The plaintiffs, naturally, take issue with the idea that either of these arguments should be sufficient to relieve the defendants from liability, given a finding that TRPA's actions deprived the plaintiffs of all economically viable use of their property. Both of these "affirmative defenses" will be discussed in turn below.

### A. Temporary Planning Moratoria

The defendants argue that both Ordinance 81–5 and 83–21 were "reasonable temporary planning moratoria," and thus not takings. The plaintiffs, understandably, point to *First English*, for the proposition that compensation is required even for "temporary" takings. Read with *Lucas*, they say, *First English* actually mandates that all temporary moratoria on development be regarded as takings.

Unfortunately—and somewhat surprisingly—the answer is not clear. The only thing that is clear is that this is an open question. As a recent Eleventh Circuit case makes clear, "whether a temporary moratorium on development necessarily effects a temporary taking" is a "significant constitutional question of first impression." *Corn v. City of Lauderdale Lakes*, 95 F.3d 1066, 1073 (11th Cir.1996), *cert. denied*, —— U.S. ——, 118 S.Ct. 441, 139 L.Ed.2d 378 (1997). The defendants have made an excellent case for the existence of this type of exception to the rule of *First English*.

Prior to *First English*, it was fairly clear that temporary, interim planning moratoria were not considered takings. Zoning boards, cities, counties, and other agencies used them all the time to "maintain the status quo pend-

ing study and governmental decision making." *Williams v. City of Central*, 907 P.2d 701, 706 (Colo.Ct.App.1995). This makes sense, given that it is hard to enact a comprehensive zoning or land use plan overnight. People acting in anticipation of such a plan's imminent passage may cause the very harm the plan is meant to prevent.

However, it is unclear whether such moratoria remain legitimate planning tools after *First English*. *First English* held that states must compensate property owners for the period an unconstitutional ordinance is in effect, even if the ordinance is later invalidated or repealed. The ordinance at issue in *First English* was a complete moratorium on construction in a flood plain, enacted immediately after a flood had destroyed the existing buildings and improvements. The Court held, essentially, that once the government has "taken" property by a moratorium on construction, the fact that the moratorium later turns out to be only temporary does not relieve the government from its obligation to pay for the duration of the taking. *First English*, 482 U.S. at 322, 107 S.Ct. 2378.

Nonetheless, several courts since *First English* have held that interim planning moratoria do not always constitute takings. *Santa Fe Village Venture v. City of Albuquerque*, 914 F.Supp. 478, 483 (D.N.M.1995); *Williams*, 907 P.2d at 704; *Woodbury Place Partners v. City of Woodbury*, 492 N.W.2d 258, 262 (Minn.Ct.App.1992) *cert. denied*, 508 U.S. 960, 113 S.Ct. 2929, 124 L.Ed.2d 679 (1993); *First English Evangelical Lutheran Church v. County of Los Angeles*, 210 Cal. App.3d 1353, 258 Cal.Rptr. 893, 906 (1989) ("*First English II*") (decision of the California Court of Appeal on remand from the Supreme Court), *reh'g denied and opinion modified* (June 23, 1989), *review denied* (Aug. 25, 1989), *cert. denied*, 493 U.S. 1056, 110 S.Ct. 866, 107 L.Ed.2d 950 (1990); *Zilber v. Town of Moraga*, 692 F.Supp. 1195, 1206–07 (N.D.Cal.1988). This is not as surprising as it may sound at first blush. *First English* itself said that "[w]e limit our holding to the facts presented, and of course do not deal with the quite different questions that would arise in the case of normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like which are not before us." *First English*, 482 U.S. at 321,

107 S.Ct. 2378. Further, there are significant differences between the moratorium at issue in *First English* and interim planning moratoria.

The primary difference between a temporary planning moratorium and the "temporary taking" of *First English* is essentially, as one court has described it, the difference between a "prospectively temporary" moratorium and a "retrospectively temporary" moratorium. *Woodbury Place Partners*, 492 N.W.2d at 262; *see also Williams*, 907 P.2d at 705; Frank Michelman, *Takings, 1987*, 88 Colum. L.Rev. 1600, 1621 (1988). In *First English*, the moratorium at issue was enacted with no termination date. In other words, it was not obviously intended to be temporary. According to its terms, it did not contain a date for its own expiration. Thus it would last until it was invalidated by a court, or repealed or amended. It only turned out to be temporary in retrospect, when it was amended to provide for the possibility of a variance or permit of some kind. An interim planning moratorium, on the other hand, is enacted with a deadline, usually for a short period of time. Thus, in a manner of speaking, the culpability of the government is less. Enacting an unconstitutional ordinance with no plans to end it is different than simply putting a hold on development for a few months while trying to formulate a plan under which development will be possible.

Also, the ordinance at issue in *First English* was assumed by the Court to have "denied appellant all use of its property for a considerable period of years." *First English*, 482 U.S. at 322, 107 S.Ct. 2378. Most "interim" moratoria do not last for a "considerable period of years." If they do, they may well become unreasonable and become a taking at some point.

In short, *First English* holds that, once there has been a taking, compensation is required. Obviously, however, if there is no taking to begin with, then no compensation will be required. Thus some courts have held that interim planning moratoria, when reasonable in scope and duration, do not effect takings at all, temporary or otherwise. *See First English II*, 258 Cal.Rptr. at 906. The plaintiffs argue that, while this may have

been a legitimate interpretation of the Supreme Court's decision in *First English* initially, it is no longer a permissible reading after *Lucas.* Since *Lucas* held that it does not really matter what the government's interest is when property has been deprived of all economically viable use, it should not matter how reasonable the delay is when all economically viable use is taken away for a short time. Some courts, however, have not found this argument persuasive. The response to this argument appears to be that, when a regulation is designed to be temporary, it will not, in fact, actually deprive property of *all* economically viable uses. When everyone expects the restrictions on use to end soon, there will likely still be a competitive market for the land. If the restrictions are permanent, on the other hand, and no one expects them to end soon, the existence of a competitive market for the land is much less likely.

Thus at least two courts have held that temporary, interim planning moratoria should not be analyzed under the "categorical" takings rule of *Lucas,* but rather under the *Penn Central,* ad hoc, factual inquiry appropriate to *non*-categorical takings. *Williams,* 907 P.2d at 706–07; *Woodbury Place,* 492 N.W.2d at 263; *see also Santa Fe Village Venture,* 914 F.Supp. at 483 ("The moratorium in this case, however, did not amount to a compensable taking of the value of the property as a whole. The challenged moratorium was limited in duration (two and one-half years), designed to preserve the status quo, and enabled Congress to take legislative action concerning a potential National Monument. Thus, the scope and time of the moratorium were limited, not substantively unreasonable, and may be upheld as a matter of law given the record.").

Whether the Supreme Court would actually uphold this view is uncertain—but it is certainly possible, since *First English* and *Lucas* can be read to allow for such a result. However, we feel that, should the issue be presented to the Supreme Court, it would reach the opposite conclusion. The language in *First English* which seems to exempt "normal delays" in the permitting process clearly does not include interim moratoria. The examples given (building permits, changes in zoning ordinances, variances) all

appear to involve delays that might occur once the process of applying for a permit has actually begun—not something that prevents the permit process from beginning at all. Further, the Court's reasoning in *First English* would not seem to exempt "prospectively" temporary takings. The Court relied heavily on cases involving temporary appropriations of property by the United States during World War II, where compensation was clearly required. *First English,* 482 U.S. at 318, 107 S.Ct. 2378. Two of those cases, at least, involved appropriations of property that *were* prospectively temporary—the government had appropriated leasehold interests with fixed termination dates. *United States v. Petty Motor Co.,* 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729 (1946); *United States v. General Motors Corp.,* 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945). Since the Court relied on these cases in finding that "retrospectively" temporary regulatory takings should be compensated, it is hard to see that it would reach a different conclusion when faced with a "prospectively" temporary regulatory taking.

■ Finally, although we acknowledge the possibility that temporary moratoria on development may not automatically effect takings—and even the wisdom of recognizing that possibility—it does not appear that either Ordinance 81–5 or Resolution 83–21 truly fall into that category. Although 81–5 was clearly intended to be temporary, since it was adopted pending the enactment of a new regional plan, there was no fixed date for when it would terminate. One could argue that the 1980 Compact fixed the date of termination, since TRPA only had thirty months total in which to enact a regional plan—but that deadline was clearly exceeded by TRPA. With respect to Resolution 83–21, there was, of course, a built-in time limit of ninety days. But the deadline had no effect—the moratorium was continued at the end of ninety days, again until the passage of the over-due regional plan. We do not mean to imply that TRPA was unreasonable in enacting temporary moratoria on building in high hazard lands, or that TRPA wasted time in the planning process and should have reached agreement on a regional plan sooner than it did. In fact, we do not see how

TRPA could have reached agreement on a regional plan any sooner. But the indefiniteness of the ordinances at issue does suggest that this is not the right case in which to hold that temporary planning *moratoria do not always* effect takings. Therefore, we hold that the fact that Ordinance 81–5 and Resolution 83–21 may have been intended to be temporary from the beginning does not exempt TRPA from the requirement of paying just compensation for the denial of the use of their land that the plaintiffs experienced during the time the two measures were in effect.

## B. Nuisance

Finally, the defendants also argue that, notwithstanding the fact that Ordinance 81–5 and Resolution 83–21 may have denied the plaintiffs all economically viable use of their property, TRPA's actions did not effect takings. According to the defendants, the uses prohibited by the ordinances constitute "nuisances" that can be restricted without a need for just compensation.

The basis for this so-called "nuisance exception" goes back over a century, and was first articulated by the Supreme Court in the case of *Mugler v. Kansas*, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887), in which the Court upheld a prohibition against the use of a building as a brewery (due to a general prohibition against the manufacture or sale of alcoholic beverages within the state of Kansas), even though the prohibition drastically reduced the value of the property. The most modern formulation of the exception, however, is in *Lucas*.[4]

*Lucas* held that, "[w]here the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with." *Lucas*, 505 U.S. at 1027, 112 S.Ct. 2886. In other words, all land is subject to some restrictions on use. If, at the time land is purchased, certain uses are restricted or prohibited, then the purchaser of that property does not acquire the right to put the land to one of those forbidden uses. Those uses are not part of the "bundle of rights" which the purchaser receives with the land. Thus, if the purchaser does put his property to such a use, the government can come in and put a stop to it without effecting a taking—even if the forbidden use was the only economically viable use of the property. *Id.* at 1029–30, 112 S.Ct. 2886.

The question, then, is whether a given use was part of the bundle of rights which a property owner acquired with her property. To resolve this question, the *Lucas* Court held that the relevant inquiry was whether the restrictions on use "inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership." *Id.* at 1029, 112 S.Ct. 2886.

Clearly, if a use would always have been considered a common law nuisance under state property law, then it can be prohibited without the prohibition's constituting a taking. What the *Lucas* opinion does not make completely clear, but which most courts since appear to have accepted, is that "newly legislated or decreed" restrictions on land use can also constitute "background principles" of state law for this purpose—so long as those restrictions became law *before* the property owner actually purchased the property subject to the restrictions. *City of Virginia Beach v. Bell*, 255 Va. 395, 498 S.E.2d 414, 417 (1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 73, 142 L.Ed.2d 57 (1998); *Anello v. Zoning Bd. of Appeals of the Village of Dobbs Ferry*, 89 N.Y.2d 535, 656 N.Y.S.2d 184, 678 N.E.2d 870, 871 (1997), *cert. dismissed*, —— U.S. ——, 118 S.Ct. 2, 138 L.Ed.2d 1036 (1997); *Gazza v. New York State Dept. of Envi. Conservation*, 89 N.Y.2d

---

4. We recognize that since *Lucas*, debate has raged over whether the "exception" discussed therein should still be referred to as the "nuisance" exception, or as something else. The plaintiffs in this case, for instance, refuse to acknowledge the continued existence of a "nuisance" exception, repeatedly referring to the exception as either the *"Lucas"* exception, or the "so-called nuisance" exception. We find this dispute to be of no moment to the questions we must resolve here, however. For the sake of convenience, we refer to the exception as the "nuisance exception," fully aware that the exception, whatever it is called, is not the same post-*Lucas* as it was prior thereto.

603, 657 N.Y.S.2d 555, 679 N.E.2d 1035, 1039 (1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 58, 139 L.Ed.2d 22 (1997); *Grant v. South Carolina Coastal Council,* 319 S.C. 348, 461 S.E.2d 388, 391 (1995); *Hunziker v. State,* 519 N.W.2d 367, 371 (Iowa 1994), *cert. denied,* 514 U.S. 1003, 115 S.Ct. 1313, 131 L.Ed.2d 195 (1995); *Scott v. City of Del Mar,* 58 Cal.App.4th 1296, 68 Cal.Rptr.2d 317, 322–23 (1997); *Aztec Minerals Corp. v. Romer,* 940 P.2d 1025, 1032 (Colo.Ct.App.1996). In such a case, the prior owner of the property may have had a valid takings claim, but subsequent purchasers probably will not.

 Thus in order to show that TRPA's actions did not effect a taking under the nuisance exception, the defendants must demonstrate that the uses prohibited by those ordinances could have been prohibited by either:

1) the common law of nuisance of either California or Nevada,[5] or

2) some affirmative state or local ordinance prohibiting such uses, which was enacted prior to the plaintiffs' acquisition of their property.

In this connection, it is important to note that this is an affirmative defense, and as such the burden is on the defendants to prove that such uses would have been enjoinable under background principles of state law. *Lucas,* 505 U.S. at 1031, 112 S.Ct. 2886 (stating that "to win its case South Carolina must do more than proffer the legislature's declaration that the uses Lucas desires are inconsistent with the public interest, or the conclusory assertion that they violate a common-law maxim such as *sic utere tuo ut alienum non laedas* .... Instead, as it would be required to do if it sought to restrain Lucas in a common-law action for public nuisance, South Carolina must identify background principles of nuisance and property law that prohibit the uses [Lucas] now intends in the circumstances in which the property is presently found").

Before delving into the common law of either Nevada or California, it is also worth noting that *Lucas* itself casts doubt on the idea that "common-law principles would have prevented the erection of any habitable or productive improvements on petitioner's land; they rarely support prohibition of the 'essential use' of land." *Id.* at 1031, 112 S.Ct. 2886. Further,

"[t]he fact that a particular use has long been engaged in by similarly situated owners ordinarily imports a lack of any common-law prohibition (though changed circumstances or new knowledge may make what was previously permissible no longer so[) ] .... So also does the fact that other landowners, similarly situated, are permitted to continue the use denied to the claimant."

*Id.* Thus it appears that the defendants face a rather difficult battle in attempting to show that the building of single-family homes at Lake Tahoe would have constituted a nuisance in either California or Nevada. Property owners who had constructed homes on high hazard lands prior to the time period at issue here have most definitely not been required to tear down their homes and recreate a natural environment.

 In California, nuisance is defined by statute as:

Anything which is injurious to health, ... or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance.

Cal. Civ.Code § 3479. There is an extensive body of case law in California on what constitutes a nuisance, and it does appear that pollution of water is generally treated as one, and has been treated as such for a long time. "The law is well settled that any use of a stream which materially fouls and adulterates the water, or the deposit or discharge therein of any filthy or noxious substances

---

5. Obviously, those plaintiffs owning land in California would be governed by California nuisance law, and those plaintiffs owning land in Nevada would be governed by Nevada nuisance law. In theory, this could result in a situation in which something might be a "nuisance" on one side of the lake but not on the other. However, we have not found this to be the case.

that so far affect the water as to impair its value for the ordinary purposes of life, or anything that renders the water less wholesome than when in its ordinary state, will constitute a nuisance, which courts of equity will enjoin, and for which a lower riparian owner, injured thereby, is entitled to redress." *Joerger v. Pacific Gas & Elec. Co.,* 207 Cal. 8, 276 P. 1017, 1025 (1929).

However, the current situation is not clearly analogous to either the code definition or the case law. All of the cases cited by the defendants require a much more significant contribution to the problem on the part of those enjoined, as well as a much more significant problem to begin with. *See, e.g., People v. Gold Run Ditch & Mining Co.,* 66 Cal. 138, 4 P. 1152, 1153–54 (1884) (upholding injunction against hydraulic mining company that had been "daily discharging into the [American] river between four and five thousand cubic yards of solid material from its said mine, to-wit, of bowlders [sic], cobbles, gravel, and sand," which, together with similar discharges of other companies, had caused the American and Sacramento Rivers to become 6 to 12 feet shallower, making navigation much more difficult, and in some places impossible, and the likelihood of flooding much greater); *People ex rel. Ricks Water Co. v. Elk River Mill & Lumber Co.,* 107 Cal. 214, 40 P. 486, 487 (1895) (upholding injunction against maintaining cattle and hogs on banks of river, where this had resulted in, among other problems, "a pile of manure about seventy feet in length, eight feet deep, and sixteen to eighteen feet in width," and which the defendant had allowed "to lie there and rot on the bank of said stream, and the drainage therefrom flow directly into the waters of said stream, and pollutes the same, and renders the waters thereof offensive to the senses and unwholesome and unfit for domestic uses"); *People v. Truckee Lumber Co.,* 116 Cal. 397, 48 P. 374, 374 (1897) (upholding an injunction against polluting the Truckee River with "large quantities of refuse matter, consisting of sawdust, shavings, slabs, edgings, waste, and other deleterious substances, the effect of which has been and is to pollute said stream and the waters thereof, and render the same unfit for use, and which substances are poisonous and deleterious to the fish in said stream, and are

killing, destroying, and exterminating them"); *Thompson v. Kraft Cheese Co. of Cal.,* 210 Cal. 171, 291 P. 204, 205–06 (1930) (upholding injunction against "emptying, throwing, discharging or permitting to escape, any dirty water, sour milk, slops, refuse, offal, or other liquid or semi-liquid matter, either directly or indirectly, by means of cesspools or otherwise, into said branch of Nicasio creek or directly upon lands of plaintiffs" such as had caused the plaintiffs' hogs to become "sickly" with a roundworm infestation); *City of Turlock v. Bristow,* 103 Cal. App. 750, 284 P. 962, 964 (1930) (upholding injunction against maintaining open irrigation ditches in city limits "in such a manner as to permit the accumulation of foul and stagnant water, refuse matter, filth, and garbage which became a breeding place for typhoid and other disease germs and permeated the air with noxious, unwholesome, and offensive vapors and odors, rendering the ditch unsanitary, causing the neighborhood to become unhealthful, and destroying the comfort and enjoyment of the homes and property of the citizens of that vicinity"); *Freitas v. City of Atwater,* 196 Cal.App.2d 289, 16 Cal.Rptr. 397, 399 (1961) (upholding injunction against polluting the water of the Atwater Main, when said pollution had resulted in "obnoxious odors" and gases that "burned the eyes" emanating from the water, as well as dead fish). It is certainly true that Lake Tahoe is faced with serious harm, which ought to be prevented if at all possible, but it is not the type of harm contemplated by California nuisance law. No testimony supported the idea that the lake will become a health hazard, or otherwise "indecent" or "offensive." The fact that the lake may turn green and opaque, and be reduced to a pale copy of its current self, is abhorrent to think on—yet not, unfortunately, a "nuisance" as defined by the pre-existing law of California.

Finally, apart from the nuisance issue, there is the possibility that some other "background principle" of California law may prohibit the use to which the plaintiffs wish to put their land. The only law we have found that might provide any basis for a finding that a pre-existing regulation prohibited certain uses of property is the Porter–

Cologne Water Quality Control Act, enacted in 1969, which amended the existing Water Code provisions. As amended, the statute defines "waste" as including "sewage and any and all other waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation ... of whatever nature." Cal. Water Code § 13050(d). The code also defines nuisance as anything that "(1) [i]s injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property.... [and] (3)[o]ccurs during, or as a result of, the treatment or disposal of wastes." Cal. Water Code § 13050(m). This has been interpreted to mean that "water pollution occurring as a result of treatment or discharge of wastes in violation of Water Code section 13000 et seq. is a public nuisance per se." *Jordan v. City of Santa Barbara*, 46 Cal.App.4th 1245, 54 Cal.Rptr.2d 340, 346 (1996); *Newhall Land & Farming Co. v. Superior Court*, 19 Cal.App.4th 334, 23 Cal.Rptr.2d 377, 381 (1993). The definition of "waste" has been interpreted as including "concentrated silt or sediment associated with human habitation and harmful to the aquatic environment." *Lake Madrone Water Dist. v. State Water Res. Control Bd.*, 209 Cal.App.3d 163, 256 Cal.Rptr. 894, 897 (1989).

However, the facts of our case are nonetheless distinguishable. *Lake Madrone*, which interpreted the Water Code to include "concentrated silt or sediment" as "waste," involved sediment which was concentrated by a dam to the point where, when released, silt up to 18 inches deep was deposited in Berry Creek, "choking its pools and shoreline and clogging its spawning areas so heavily as to destroy fish and aquatic life." *Lake Madrone*, 256 Cal.Rptr. at 895. The one act that was enjoined was the releasing of water from the bottom of the dam, where all the sediment was collected. Thus the relationship between the enjoined act and the damage was much more direct, and the damage much more immediate. Although the runoff at Lake Tahoe may be "associated with human habitation," the statutorily defined nuisance only applies when such

"waste" is discharged "during, or as a result of, the *disposal or treatment* of wastes." Simply building a house does not seem to fall within this definition. In *Lake Madrone*, the defendant did commit an act that could be construed as "disposing" of wastes—i.e., opening the gates in the dam and releasing the sediment-choked water into the stream. Thus we hold that the Porter–Cologne Act, although it may have modified California's common law of nuisance, did not so modify it that the activities at issue here could be considered nuisances under that law. (For future reference, though, we note here that even if the Porter–Cologne act were held to constitute a sufficient "background principle" of state law, it might not apply to all of the plaintiffs in this case anyway. Some plaintiffs may well have purchased their land prior to 1969. Those facts are not in the record developed so far.)

Finally, it should be noted that the fact that fish might in the future be threatened in Lake Tahoe as a result of the increased sediment runoff, which was suggested by some of the evidence at trial, does not appear to be enough to prove an existing nuisance. It appears that actual damages may be necessary before a nuisance can be enjoined. "In California, an action for private nuisance cannot be maintained for an interference in the use and enjoyment of land caused solely by the fear of future injury.... Damage or injury has long been considered an essential element of a cause of action for nuisance." *Jordan*, 54 Cal.Rptr.2d at 346. Thus we cannot hold that anything "inhere[d] in the title" of the plaintiffs' properties that would prevent the construction of single-family homes thereon. *Lucas*, 505 U.S. at 1029, 112 S.Ct. 2886.

In Nevada, there is no case law on pollution of water as a nuisance. As in California, nuisance is defined by statute as:

> Except as otherwise provided in this section, anything which is injurious to health, or indecent and offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property ....

N.R.S. 40.140(1). The California statute was first adopted in 1872; the Nevada statute in

1911. Given the Nevada Supreme Court's preference for interpreting statutes adopted nearly verbatim from other states in light of the other state's case law existing at the time of adoption, *Peke Resources, Inc. v. Fifth Judicial Dist. Court In and For the County of Esmeralda,* 113 Nev. 1062, 944 P.2d 843, 847 (1997), the Nevada statute would probably be interpreted much along the lines of the early California cases, under which, as we have seen, this case would clearly not constitute a nuisance.

 As in California, there is one law in Nevada that could conceivably provide a basis for a finding that some other "background principle" of Nevada law prohibited construction on the plaintiffs' land—that is, the "Nevada Water Pollution Control Law," originally passed in 1973, and currently codified at N.R.S. 445A.300–445A.730. Section 445A.325 defines "contaminant" as "any physical, chemical, biological or radiological substance or matter which is added to water." Section 445A.400 defines "pollutant" as "dredged soil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal and agricultural waste discharged into water." This definition seems even less likely to encompass the erosion runoff at issue here than California's definition. Thus we do not interpret this statute to prohibit the construction of single-family homes on the plaintiffs' property.

Finally, with respect to both Nevada and California, we note that we have assumed thus far that all current plaintiffs purchased their land prior to the enactment of 81–5. Should this not be the case for any individual plaintiff, we think that such a plaintiff would be barred from receiving damages. Ordinance 81–5 and the following actions would appear to constitute a "background principle of state law" applicable to all subsequent purchasers, who are presumed to have knowledge of all such restrictions. Therefore, we hold that the defendants have not proven that the "nuisance exception" to the categorical takings rule of *Lucas* should apply here.

*IT IS THEREFORE HEREBY ORDERED* that TRPA shall pay damages to the plaintiffs for the period from August 24, 1981, to April 25, 1984, except as to the Nevada-side Class 1–3 plaintiffs, as to whom TRPA shall pay damages only for the period from August 27, 1983, to April 25, 1984.